PROGRESSIVE COUNTY MUTUAL
INSURANCE COMPANY,
Petitioner,

v.

Paul SINK, Respondent.

No. 01–0534.

Supreme Court of Texas.

Argued Oct. 9, 2002.

Decided May 15, 2003.

Rehearing Denied July 3, 2003.

Robert Alan York, David W. Holman, Holman & Keeling, P.C., Mark Lapidus, Burck Lapidus & Lanza, Houston, for petitioner.

Robert Glen Moll, Hill Rivkins & Hayden LLP, Houston, for respondent.

Justice OWEN delivered the opinion of the Court, in which Justice HECHT, Justice ENOCH, Justice JEFFERSON, Justice SMITH, and Justice WAINWRIGHT joined.

This case concerns coverage for a "temporary substitute" vehicle under the standard Texas Personal Auto Policy. The issue is whether the policy provides liability coverage when the insured, whose own vehicle is disabled, takes and drives an automobile owned by someone who is not a family member without permission or the reasonable belief that he has permission and is involved in an auto accident with a third party. The trial court correctly held that there is no liability coverage under these circumstances, and the court of appeals therefore erred in reversing the trial court.[1] Accordingly, we reverse the court of appeals' judgment and render judgment that the plaintiff, who is the person with whom the insured collided, take nothing.

## I

Joshua McCauley's pickup truck became disabled. He was at that time employed by Alamo Rent–A–Car, and while on the job, he took one of its rental cars to drive to a location that is not disclosed in the record to get his tools so that he could attempt to repair his truck. It is uncontested that McCauley did not obtain permission from Alamo to use any of its vehicles and did not believe that he had permission to use the car in question. While returning to work in Alamo's car, McCauley was involved in an accident with Paul Sink.[2]

Sink sued McCauley and obtained a favorable judgment that was subsequently discharged in bankruptcy. Sink then commenced this action against McCauley's auto insurance carrier, Progressive County Mutual Insurance Company, under its policy insuring McCauley's truck. Sink claimed that he was a third-party beneficiary of McCauley's policy and sought benefits under that policy's liability coverage.

---

1.  47 S.W.3d 715, 721.

2.  Sink offered deposition testimony in a bill of exception in the trial court as evidence that McCauley took Alamo's car because his own was temporarily disabled. Progressive disputes whether this evidence was considered by the trial court. We include the evidence in our discussion, however, without deciding whether it was admitted or improperly excluded, because it does not affect the outcome of this case.

There were additional proceedings in the trial court, not material to our decision, that we do not recount. We focus only on the trial court's disposition of the third-party beneficiary claim by Sink against Progressive, which was severed from Sink's other claims.

A jury was empaneled on Sink's severed claim against Progressive, and opening statements were made. However, the trial court then dismissed the jury, concluding that there were no fact issues and only a question of law existed. The trial court then determined that the vehicle owned by McCauley's employer was not covered by the insurance policy issued for McCauley's truck. The court of appeals agreed that there were no factual disputes, and the parties did not contend otherwise.[3] But the court of appeals construed the unambiguous policy provisions differently from the trial court and therefore reversed the trial court's judgment and remanded the case so that Sink's claim under McCauley's liability policy could proceed.[4] The only issue presented to us today is the proper interpretation of the policy.

## II

The liability coverage section of the policy provides that Progressive "will pay damages for bodily injury or property damage for which any covered person becomes legally responsible because of an auto accident." The policy contains a broad exclusion that precludes coverage for any person who uses a vehicle without a reasonable belief that he or she is entitled to do so, but the policy also states that the exclusion does not apply to an insured or an insured's family member who uses "your covered auto":

EXCLUSIONS

A.  We do not provide Liability Coverage for any person:

....

8.  Using a vehicle without a reasonable belief that that person is entitled to do so. This exclusion (8.) does not apply to you or any family member while using *your covered auto*.[5]

The policy's definition of "your covered auto" contains, among other things, the reference to a "temporary substitute" vehicle:

G.  "Your covered auto" means:

....

4.  Any auto or trailer you do not own while used as a temporary substitute for any other vehicle described in this definition [e.g., a vehicle identified in the policy Declarations or a vehicle acquired by the insured during the policy period] which is out of normal use because of its:

a.  breakdown;

b.  repair;

c.  servicing;

d.  loss; or

e.  destruction.

The court of appeals concluded that a vehicle used by an insured or an insured's family member as a temporary substitute for another vehicle that is "out of normal use" is covered, even if used without the permission of the owner.[6] The court reasoned that paragraph 8 of the exclusions expressly does not apply to "your covered auto," which includes a "temporary substitute vehicle."[7] Accordingly, the court of

3.  *Id.* at 718.

4.  *Id.* at 721.

5.  Emphasis added.

6.  *Id.*

7.  *Id.*

appeals held that because McCauley "was driving a temporary substitute vehicle because his own vehicle had become disabled," it did not matter that he drove the "substitute vehicle" without permission.[8]

Progressive argued in the court of appeals and maintains before this Court that although there is no definition in its policy of what constitutes a "temporary substitute" vehicle, courts should look to the definition of "temporary substitute automobile" used in the Texas standard policy form that preceded the current one. Alternatively, Progressive contends that the term "temporary substitute" should be given its commonly understood meaning, which, it argues, is that a substitute vehicle must be used with the permission of its owner or at least a reasonable belief that the owner consented.

Auto insurance policy forms were formerly adopted by the State Board of Insurance and are now adopted within the Texas Department of Insurance,[9] and with certain exceptions not relevant here, carriers providing motor vehicle insurance can only use a form adopted by the Board.[10] The Texas Personal Auto Policy ("TPAP"), the standard form policy that is at issue in this case, was adopted by the Board to be effective in 1981 and was amended in 1983. The standard form in effect prior to then, called the Texas Family Automobile Policy, expressly defined "temporary substi-

tute automobile" and said that any temporary substitute must be used "with the permission of the owner":

DEFINITIONS

. . . .

"temporary substitute automobile" means any automobile or trailer, not owned by the named insured, while temporarily used with the permission of the owner as a substitute for the owned automobile or trailer when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction.

When the Board of Insurance adopted the TPAP, it said:

Due to the certain [sic] differences between the Texas Personal Auto Policy and the Texas Family Automobile Policy, which the Texas Personal Auto Policy replaces, the Board is of the opinion that some expression of its intent is desirable. The promulgation of the Texas Personal Auto Policy in place of the Texas Family Automobile Policy is intended by the State Board of Insurance to state more clearly the contract between the insured and insurer. The State Board of Insurance herein states its intention to be that unless the Texas Personal Auto Policy has clearly changed the scope and nature of a coverage from that provided by the Family Automobile Policy, the courts should be

---

8. *Id.*

9. The State Board of Insurance is now called the Texas Department of Insurance, which is composed of the commissioner of insurance and other officers and employees to implement insurance laws in Texas. TEX. INS. CODE §§ 31.003, 31.007. For simplicity and because of references in the Insurance Code to "the Board," we will continue to refer to that agency in this opinion as the State Board of Insurance or "the Board." *Id.* § 31.007.

10. The Texas Insurance Code provides:

(2) Except as provided by Subsections (3) and (4) of this article, an insurer may only use a form adopted by the Board under this section in writing motor vehicle insurance delivered, issued for delivery, or renewed in this State. A contract or agreement not written into the application and policy is void and of no effect and in violation of the provisions of this subchapter, and is sufficient cause for revocation of license of such insurer to write automobile insurance within this State.

TEX. INS.CODE art. 5.06(2).

guided by prior decisions construing the provisions of the Family Automobile Policy.[11]

We must look at the revised policy as a whole and the words used in that policy to determine whether the Board's deletion of a definition for "temporary substitute automobile" "clearly changed the scope and nature of a coverage from that provided by the Family Automobile Policy."[12] Similarly, we must look to the revised policy to determine whether it expanded coverage for "temporary substitute" vehicles simply because exclusion 8 does not apply to an insured or an insured's family member while using "your covered auto," which includes the term "temporary substitute" vehicle.

▮▮▮ It is well settled that the general rules of contract construction apply to the interpretation of insurance contracts.[13] If a contract as written "can be given a definite or certain legal meaning," then it is unambiguous as a matter of law.[14] However, an insurance contract is ambiguous and will be interpreted in the manner that "most favors coverage" if it is "subject to more than one *reasonable* interpretation."[15]

▮▮▮ In general, a court construing a contract "must strive to give effect to the written expression of the parties' intent" by "read[ing] all parts of a contract togeth-er."[16] In cases like this, however, where the policy forms are mandated by a state regulatory agency, the actual intent of the parties is not material.[17] We held almost fifty years ago in *United States Insurance Co. of Waco v. Boyer* that when construing such policies, we look to determine the ordinary, everyday meaning of the words to the general public.[18] We said,

> now with the insurance business regulated and the policy forms prescribed by a State Insurance Commission, the court in construing a policy determines the everyday meaning of the words to the general public—the meaning of the words 'in common parlance'—'the usual and popular understanding of the term.' As a practical matter, the actual intent involved in the precise words is as much or more the intent of the Insurance Commission which prescribes the wording of the policy as it is the intent of the parties. It is unlawful to issue a policy in words other than those expressly approved by the Insurance Commission, and every insurance company selling this type of insurance is required to word its policies precisely alike. Uniform policies are necessary to a uniform rate structure, which in turn resulted from the public injury caused by highly competitive wildcat insurance schemes. Therefore, a true search for what the courts usually speak of as the intent of parties will not be an inquiry as to what

---

**11.** Tex. Bd. of Ins., *Adoption of Rule and Form Amendments for Texas Personal Auto Policy and Deletion of Rule References and Forms Applicable to the Family Automobile Policy; Adoption of Texas Personal Auto Policy Standard Provisions and Printing Instructions,* Docket No. 37691 (Aug. 8, 1980).

**12.** *Id.*

**13.** *Grain Dealers Mut. Ins. Co. v. McKee,* 943 S.W.2d 455, 458 (Tex.1997); *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995).

**14.** *McKee,* 943 S.W.2d at 458; *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983).

**15.** *McKee,* 943 S.W.2d at 458 (emphasis added).

**16.** *Beaston,* 907 S.W.2d at 433.

**17.** *United States Ins. Co. of Waco v. Boyer,* 153 Tex. 415, 269 S.W.2d 340, 341 (1954).

**18.** *Id.*

the words of the contract meant to this particular insurer or insured. It is, first, an effort to determine the ordinary lay meaning of the words to the general public, and, in the light of this meaning, it is, second, an examination of the choice the purchaser had and the choice he made.[19]

■ Because the term "temporary substitute" is not defined in the policy, we consider the ordinary, everyday meaning of the words used. It is common to rent a car, use a loaner car, or borrow a car from a friend or family member while one's primary vehicle is undergoing service or repair. The generally accepted meaning of "temporary substitute" vehicle does not, however, include taking a vehicle without at least a reasonable belief of entitlement to its use.

This interpretation is not in conflict with paragraph 8 of the exclusions. Indeed, it is in harmony with that exclusion. Paragraph 8 says that a person using a vehicle without a reasonable belief that he or she is entitled to do so is not covered. But this exclusion does not apply to the insured or any family member while using "your covered auto." Thus, under the current TPAP, "your covered auto" includes a vehicle owned by an insured and "used as a temporary substitute" by a teenage member of the insured's family. But the general public understands that if a vehicle driven by a teenager and expressly covered by the policy breaks down and the teenager steals a neighbor's car, the stolen vehicle would not be regarded as a "temporary substitute" vehicle. Nothing in the use of the term "temporary substitute" vehicle suggests otherwise. The analysis would not change if the teenager "bor-

rowed" the neighbor's car without the neighbor's knowledge or permission. The same can be said of an adult insured who "borrows" his or her employer's car without permission. The ordinary connotation of a "temporary substitute" vehicle is that it is a vehicle used with the owner's permission, or at least a reasonable belief that the owner consented.

Sink did not dispute in the trial court either that McCauley used his employer's vehicle without permission or that McCauley did not believe he had his employer's permission. We do not imply, however, as the dissent suggests, that McCauley committed theft.[20] The point to be made is that if we were to accept the interpretation of the policy put forth by Sink and the dissent, "temporary substitute" would include not only a vehicle used without permission but also a stolen vehicle, as long as the user's or thief's own vehicle was out of commission for one of the reasons stated in the policy.

The dissent contends that this interpretation is supported by the "policy's plain language."[21] The dissent then says that even were the policy ambiguous, we must accept Sink's interpretation if it is a reasonable one.[22] The policy is not ambiguous, as both the trial court and the court of appeals concluded. But even were the policy ambiguous, Sink's interpretation is unreasonable. As just noted above, Sink's reading of the policy would include stolen vehicles, but the only time that a stolen vehicle would have liability coverage as a "temporary substitute" would be when the thief's own vehicle is out of use due to a breakdown, repair, servicing, loss or destruction. Such a construction would

**19.** *Id.* (internal citations omitted).

**20.** 107 S.W.3d at 555 (PHILLIPS, C.J., dissenting).

**21.** *Id.* at 555.

**22.** *Id.* at 556.

make no sense whatsoever if the State Board of Insurance had intended to extend liability coverage to stolen vehicles.

The dissent suggests that the State Board of Insurance may have intended to avoid "proof problems." [23] With all due respect, this argument makes no sense either. Clearly, the Board's change in paragraph 8 of the exclusions was intended to avoid "proof problems" when a family member uses a covered auto without express permission. But that does not mean that the Board intended to include stolen vehicles within the meaning of "temporary substitute," or more to the point, some stolen vehicles but not others to avoid "proof problems." Under the dissent's construction of the policy, when there is "proof" that the thief's own covered vehicle was out of service because of a breakdown, or another of the enumerated circumstances, there is coverage. But if there is no "proof" that the thief's vehicle was out of service for one of those reasons, there is no coverage. "Proof problems" remain under Sink's and the dissent's interpretation of "temporary substitute."

Another hypothetical illustrates that Sink's interpretation of the policy is unreasonable. Suppose that Green, the insured, needed to transport a sofa, but his truck had a flat tire, so he used another's truck without permission and caused an accident. Suppose that Green's friend Bob also needed to transport a sofa, but he drives a small car and therefore used someone's pickup truck without permission and caused an accident. We can see no reasonable basis for concluding that the Board of Insurance meant for the "temporary substitute" vehicle provisions of the policy to cover the vehicle Green took but not the vehicle Bob took simply because Green's vehicle was "out of normal use."

■ As discussed above, in construing a standard-form policy like the TPAP, we must make "an effort to determine the ordinary lay meaning of the words to the general public, and, in light of this meaning," to conduct "an examination of the choice the purchaser had and the choice he made." [24] In order to accept Sink's interpretation of the policy, we would have to conclude not only that a thief believes he is buying liability coverage for stolen vehicles he may drive, but also that he understands there is coverage for stolen vehicles if, and only if, the thief's own covered vehicle is out of service. This is untenable.

The dissent's argument regarding the definition of property damages is equally lacking in merit. The policy says, "[p]roperty damage" includes damage to "[y]our covered auto, not including a temporary substitute auto." This provision simply means that no temporary substitute auto is covered for property damage. That does not answer the question of what is or is not a "temporary substitute" vehicle.

Finally, the dissent suggests that the State Board of Insurance may have intended to "shift the responsibility for costs from an innocent victim to the insurance company that has specifically contracted to insure the driver." [25] Why would the Board extend coverage in such limited circumstances, but not others, if its aim were to protect innocent third parties?

■ The law generally requires a person to maintain liability insurance for a motor vehicle in order to operate that vehicle,[26] and third parties injured in an

---

23. *Id.* at 558.

24. *Boyer,* 269 S.W.2d at 341.

25. 107 S.W.3d at 558 (PHILLIPS, C.J., dissenting).

26. TEX. TRANSP. CODE § 601.051.

accident for which the insured is legally responsible are treated as third-party beneficiaries of the policy.[27] However, the State Board of Insurance, in balancing the public interests, has determined that there are certain risks insurance companies are not required to assume, as evidenced by the coverage exclusions. Accordingly, despite the negative effect it could have on some innocent third parties, the Board made a policy decision not to require coverage when a person drives a vehicle without a reasonable belief of entitlement, with limited exceptions not applicable here involving permission among the insured and his or her family members. We also note that the purpose of uninsured/underinsured motorists coverage [28] is to cover just these kinds of situations in which a third party is legally entitled to recover from the person responsible for the accident but is unable to do so. In fact, Sink recovered $100,000 under the uninsured/underinsured motorists coverage provision of his own policy after the accident with McCauley. Our interpretation of the term "temporary substitute" vehicle as used in the TPAP fully comports with the public policy of the State.

\*    \*    \*    \*    \*    \*

The trial court was correct in holding that the car McCauley took from his employer did not constitute a "temporary substitute" vehicle under the policy insuring McCauley's truck. Accordingly, we reverse the court of appeals' judgment and render judgment that Sink take nothing.

Chief Justice PHILLIPS filed a dissenting opinion, in which Justice O'NEILL and Justice SCHNEIDER joined.

Chief Justice PHILLIPS filed a dissenting opinion, in which Justice O'NEILL and Justice SCHNEIDER joined.

The Court today holds that the "ordinary, everyday meaning" of a "temporary substitute" auto is "a vehicle used with the owner's permission, or at least a reasonable belief that the owner consented." 107 S.W.3d 548. Maybe this is true. But the insurance policy at issue does not condition coverage on whether permission was granted or not. Because the plaintiff in this case is entitled to recovery on the plain terms of the policy, I respectfully dissent.

I

As a basic tenet of insurance-contract construction, we have held that "[t]he purpose of an exclusion is to take something out of the coverage that would otherwise have been included in it." *Liberty Mut. Ins. Co. v. Am. Employers Ins. Co.*, 556 S.W.2d 242, 245 (Tex.1977). Here, the policy would clearly provide coverage regardless of whether or not the driver had permission, except for the reasonable-belief-of-entitlement exclusion. This exclusion states: "We do not provide Liability Coverage for any person: ... 8. Using a vehicle without a reasonable belief that that person is entitled to do so." This exclusion is the only basis for a permission requirement.

If that were the entire text of the exclusion, then the Court would be correct in holding that the insured must have permission to drive a temporary substitute auto.

27. *Dairyland County Mut. Ins. Co. of Tex. v. Childress*, 650 S.W.2d 770, 775 (Tex.1983).

28. *See* Tex. Ins.Code art. 5.06–1(1) (requiring liability insurance policies to include uninsured/underinsured motor vehicle coverage unless the named insured rejects such coverage in writing); *Stracener v. United Servs. Auto. Ass'n*, 777 S.W.2d 378, 382 (Tex.1989).

But the policy includes an exception to the exclusion, which provides: "This exclusion (8.) does not apply to you or any family member while using your covered auto." Because of this language, the relevant question becomes whether the car McCauley was driving was within the meaning of "your covered auto" at the time of the accident. If it was, this exception applies and he did not need permission from the owner for his coverage to apply.

Under the TPAP, the term "your covered auto" is defined as follows:

G. Your covered auto means:

    1. Any vehicle shown in the Declarations;

    2.

        I. Any of the following types of vehicles on the date you became the owner:

        a. a private passenger auto; or

        b. a pickup or van. . . .

    3. Any trailer you own.

    4. Any auto or trailer you do not own while used as a temporary substitute for any other vehicle described in this definition which is out of normal use because of its:

        a. breakdown;

        b. repair;

        c. servicing;

        d. loss; or

        e. destruction.

Thus, the policy definition of "your covered auto" includes a non-owned "temporary substitute" used when the primary vehicle is out of commission for servicing or repair. Without dispute, McCauley's own car was disabled and the borrowed car was a substitute for it.

While the Court's opinion frequently uses the word "thief" to describe one who borrows a car without permission, in this case there is no accusation that McCauley acted in a criminal manner. McCauley contended to Progressive that he used the car with the permission of his employer, Alamo Rent–A–Car, and that he had often been given permission to use Alamo cars in the past. According to the record, Sink also sought recovery under Alamo's insurance, but the claim was denied after Alamo denied having given McCauley permission to drive its car. Progressive then sued McCauley, seeking a judicial declaration that it was not obligated to defend or indemnify him because of the permission exclusion. Progressive won a default judgment after McCauley failed to answer or appear. Progressive's Requests for Admission—which included a request for an admission that McCauley did not have a reasonable belief of entitlement to use Alamo's car—were deemed granted. At the trial between Sink and Progressive, Sink did not dispute the question of permission.

Regardless of the circumstances surrounding the car's use, however, the borrowed car clearly fits the policy's description of a "temporary substitute" and therefore qualifies as McCauley's "covered auto" under the policy. The policy's plain terms state that the reasonable-belief-of-entitlement requirement "does not apply to you or any family member while using your covered auto." Consequently, under the policy's plain language, McCauley was driving a "covered auto" and was therefore covered by his policy.

Another part of the policy shows that the Board did not intend for a temporary substitute auto to incorporate a permission requirement.[1] In Part C, the policy pro-

---

1. The policy at issue was drafted by the State Board of Insurance. In general, a Texas automobile insurer "may only use a form adopted by the Board" for auto insurance. TEX. INS. CODE art. 5.06(2).

vides that "[p]roperty damage" includes damage to "[y]our covered auto, not including a temporary substitute auto." Had the Board intended the exclusion found today by the Court, it would have included additional language to explain that the reasonable-belief-of-entitlement requirement likewise "does not apply to you or any family member while using your covered auto *not including a temporary substitute auto.*" Since the Board chose not to use this language, the policy must be construed as written: that a reasonable belief of entitlement is not required for drivers using their "covered autos," including temporary substitute autos.

Because the TPAP in 1981 and the Texas Family Automobile Policy (TFAP) before that both required permission for all temporary substitute vehicles, the Court concludes that the policy before us today must also be limited. But in 1983, the State Board of Insurance amended the policy to provide that the permission requirement "does not apply to you or any family member while using your covered auto." State Board of Insurance, Board Order 43611 (Sept. 16, 1983). The Board expressed its overall intent as "an effort to clarify, to remove possible ambiguities and to *broaden coverage.*" *Id.* (emphasis supplied). The Board further explained its decision to add this exception to the permission requirement: "It is proposed to amend this liability coverage exclusion to make it clear that the exclusion does not apply to the insured or to any family member while using the covered auto." Thus, through this amendment, the Board removed any permission requirement for an insured's "covered auto." The Board's decision to amend the policy should be respected, as the Legislature gave the Board the authority to write policies and set rates for automobile liability insurance policies. Tex. Ins.Code art. 5.01, 5.06.

## II

Although I believe that the policy language clearly excepts temporary substitute automobiles from the permission requirement, I would reach the same result if the exclusion were unclear. If an exclusionary clause in an insurance contract is ambiguous, we " 'must adopt the construction . . . urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.' " *Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 741 (Tex.1998) (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991)). Under this rule, Progressive must show that the interpretation urged by Sink—the exclusion of temporary substitute automobiles from the permission requirement—is itself unreasonable. *Id.*

Courts in other jurisdictions have held that such an exclusion is not unreasonable. Under similar facts, they have concluded that permission is not required under the insurance contract unless the contract itself contains such a requirement. *See, e.g., Densmore v. Hartford Accident & Indem. Co.,* 221 F.Supp. 652, 657 (W.D.Pa.1963); *Hardware Mut. Cas. Co. v. Hopkins,* 106 N.H. 412, 213 A.2d 692, 698 (1965).

In *Densmore,* the driver had purchased an insurance policy for his car. He totaled the car in an accident, went to jail, and "[a]fter discharge from the jail, . . . stole an automobile, drove it to Pennsylvania, and became involved in [another] accident." *Id.* at 654. The insurance company argued that the stolen car could not be a "temporary substitute" under the insurance policy, but the court looked to the plain language of the insurance contract and found "no provision therein which relates to a stolen vehicle." *Id.* Consequent-

ly, the court found coverage, placing responsibility on the insurance company to "specifically set forth in the insurance contract that coverage would not exist" in such situations. *Id.* The court further noted that "when the accident occurred ... the insured ... was not being pursued by police officers, and the accident ... occurred solely through negligence, the theft being merely incidental to the occurrence." *Id.* at 654–55.

In *Hopkins*, a teenager caused a fatal collision while driving a car that had been lent to his parents. *Hopkins*, 213 A.2d at 693. Although the owner had requested that the teenager not be permitted to drive the car, his parents allowed him to use it anyway. *Id.* at 694. The teenager's insurance company argued that coverage was precluded because the owner had not given permission to the driver. *Id.* Citing *Densmore*, the court concluded that "[t]he fact that [the teenager] did not have permission from [the owner] to drive the garage car does not change its status as a 'temporary substitute automobile.' ... It has been held that [even] a stolen motor vehicle may become a temporary substitute automobile." *Id.* at 698.

In fact, until today no court has enforced a permission requirement unless the insurance policy explicitly contained such a requirement for temporary substitute automobiles. *See, e.g., Vidaurri v. Maryland Cas. Co.*, 444 S.W.2d 767, 770 (Tex.Civ. App.-San Antonio 1969, writ ref'd n.r.e.); *Mission Ins. Co. v. Mackey*, 340 F.Supp. 824, 828 (W.D.Mo.1971). *Vidaurri* dealt with the TFAP, which defined a temporary substitute automobile as "an automobile not owned by the named insured, while temporarily used with the permission of the owner...." *Vidaurri*, 444 S.W.2d at 768. Consequently, the court in *Vidaurri* held that a driver who borrowed his brother's car did not have insurance coverage,

as his brother had not given him permission to use the car. *Id.* at 770. The policy in *Mackey* similarly contained an express permission requirement. *Mackey*, 340 F.Supp. at 828. The court noted that while *Densmore* "held that a stolen automobile could constitute a 'temporary substitute automobile' within the meaning of an insurance policy which did not place any other limitations on the definition of 'temporary substitute automobile,'" that rule should not apply when a policy contained an express permission requirement. *Id.* Thus, "when the policy has specifically limited the meaning of 'temporary substitute automobile' to one used with permission of the owner, that limitation has been deemed to be effective." *Id.*

## III

The Court's opinion today points out that exempting temporary substitutes from the permission requirement can lead to an inconsistent result: a person injured by someone driving a car without permission can recover from the driver's insurance policy if the driver's own car is disabled, but the victim cannot recover if the driver's own car is in perfect working condition. While admittedly this is an anomaly, I do not believe that it renders the permission exception unreasonable. Instead, I believe that the State Board of Insurance may have simply wished to carve out a narrow exception in order to minimize proof problems.

Proof problems are obviously possible when the driver of a borrowed car gets into an accident. The car's owner may be tempted to deny having given the driver permission to use the car, either to avoid suffering an increase in insurance rates or, in some cases, to avoid potential liability for negligent entrustment. Furthermore, a person responsible enough to purchase an insurance policy is unlikely to simply

steal a car. On the other hand, family members often borrow each other's cars in the event of a breakdown. Consequently, the State Board of Insurance may have reasonably decided to simply avoid such proof problems altogether by exempting all "covered autos"—including temporary substitute autos—from the permission requirement.

The Insurance Services Office (ISO), a national organization that publishes standard policy forms, was apparently aware of such proof problems when it amended its Personal Auto Policy to exclude "a 'family member' using 'your covered auto' which is owned by you" from its permission requirement. The ISO amendment is very similar to the Texas amendment, which provides that the permission requirement "does not apply to you or any family member while using your covered auto." According to an insurance-industry analyst, the change in the ISO PAP was designed to provide "coverage ... to the usage of these vehicles with or without permission" so that "the carrier and the agent will no longer be in the middle of this type of family squabble." PHYLLIS VAN WYHE, 1998 AUTO REVISIONS, *at* http://w ww.insurancece.com/resources/articles/autochanges.pdf (last visited May 7, 2003). Consequently, it is not unreasonable to think that the Texas State Board of Insurance may have added its exception for the same reason.

The permission exception may also be an attempt to shift the responsibility for costs from an innocent victim to the insurance company that has specifically contracted to insure the driver. For example, one commentator argued that the comprehensive permission requirement originally found in the TPAP represented "an attempt to shift the loss to an innocent victim rather than having the insurance company pay for the negligent conduct of its insured." Bob Roberts, *The New "Texas Personal Auto Policy"—A Comparison of Benefits with the Old "Texas Family Automobile Policy"*, 16 TRIAL L. FORUM 2, 5 (1981). He advocated changing the policy to provide coverage to the named insured "no matter what vehicle he is driving or under what circumstances." *Id.* While the State Board of Insurance never went that far, two years later it did amend the policy to except "you or any family member while using your covered auto" from the permission requirement.

For these reasons, I would affirm the court of appeals' judgment.